# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

### No. 14-1641

_____

## UNITED STATES,
**Appellee**

**v.**

## DANIEL E. CARPENTER,
**Defendant-Appellant**

_____

**On Appeal from an Opinion and Order of the United States District Court
for the District of Massachusetts**

_____

## REPLY BRIEF OF DEFENDANT-APPELLANT
## DANIEL E. CARPENTER

_____

**Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-8616 (Telephone)
(617) 338-9538 (Fax)
homanlaw@aol.com**

# TABLE OF CONTENTS

I.    THE DISTRICT COURT LACKED JURISDICTION
      TO ENTER THE FORFEITURE ORDER . . . . . . . . . . . . . . . . . .    1

II.   CARPENTER DID NOT "ACQUIRE" THE MONEY
      ORDERED TO BE FORFEITED AS REQUIRED UNDER
      §981(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

      A.    Statutory and Legal Framework . . . . . . . . . . . . . . . . . . . . .    6

      B.    The District Court Correctly Concluded that §981(a)(2)(B)
            Supplies the Applicable Definition of "Proceeds"
            in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

      C.    Carpenter Did Not "Acquire" the Monies He Has
            Been Ordered to Forfeit . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

      D.    At Minimum, the Statute is Grievously Ambiguous,
            and the Rule of Lenity Should be Applied . . . . . . . . . . . . .    19

III.  THE $14 MILLION FORFEITURE ORDER VIOLATES
      THE EXCESSIVE FINES CLAUSE OF THE EIGHTH
      AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

IV.   CARPENTER WAS ENTITLED TO A JURY
      DETERMINATION OF THE FORFEITURE AMOUNT . . . . . .    22

V.    EVEN IF CARPENTER COULD BE FOUND TO HAVE
      "ACQUIRED" THE EXCHANGORS' FUNDS FOR
      PURPOSES OF APPLYING §981(a)(2)(B), THE
      FORFEITURE AMOUNT SHOULD BE REDUCED BY
      THE AMOUNT OF MONEY RETURNED TO THE
      EXCHANGORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

ii

# TABLE OF AUTHORITIES

## **Cases**

*Alleyne v. United States*, 570 U.S. 99 (2013) . . . . . . . . . . . . . . . . . . . . . .   23

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . .   *22*

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982) . . . . . .   2

*Huddleston v. United States*, 415 U.S. 814 (1974) . . . . . . . . . . . . . . . . . .   13

*In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205
    (11th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Libretti v. United States*, 516 U.S. 29 (1995) . . . . . . . . . . . . . . . . . . . . . .   23

*Mendia v. Garcia*, 874 F.3d 1118 (9th Cir. 2017) . . . . . . . . . . . . . . . . . .   5

*Rajaratnam v. United States*, 736 Fed. App'x 279 (2d Cir. 2018) . . . . . .   18

*SEC* v. *Rajaratnam*, 918 F.3d 36, 43 (2d Cir. 2019) . . . . . . . . . . . . . . . .   18

*Sekhar v. United States*, 570 U.S. 729 (2013) . . . . . . . . . . . . . . . . . . . . . .   13

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . .   13

*Southern Union Co. v. United States*, 567 U.S. 343 (2012) . . . . . . . . . . .   22, 23

*United States v. Allen*, 76 F.3d 1348 (5th Cir. 1996) . . . . . . . . . . . . . . .   16

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) . . . . . . . . . . . .   8

*United States v. Apazidis*, 523 Fed. App'x 17 (2d Cir. 2013) . . . . . . . . .   17

*United States v. Balsiger*, 910 F.3d 942 (7th Cir. 2018) . . . . . . . . . . . . .   8

*United States v. Bonventre*, 646 Fed. App'x 73 (2d Cir. 2016) . . . . . . . .     11

*United States v. Bradley*, 897 F.3d 779 (6th Cir. 2018) . . . . . . . . . . . . . .     24

*United States v. Butler*, 2013 WL 2298184 (E.D.Va. May 24, 2013) . . .     10

*United States v. Cardoza*, 790 F.3d 247 (1st Cir. 2015) . . . . . . . . . . . . .     5

*United States v. Carpenter*, 736 F.3d 619 (1st Cir. 2013) . . . . . . . . . . . .     11

*United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006) . . . . . . . . . . . . . .     17

*United States v. Chin*, 913 F.3d 251 (1st Cir. 2019) . . . . . . . . . . . . . . . .     2, 4

*United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012) . . . . . . . . . . .     14, 15

*United States v. Crumpler*, 229 Fed. App'x 832 (11th Cir. 2007) . . . . . .     17

*United States v. DeFries*, 129 F.3d 1293  (D.C. Cir.  1997) . . . . . . . . . . .     8

*United States v. Emor*, 850 F.Supp.2d 176 (D.D.C. 2012) . . . . . . . . . . . .     11

*United States v. Executive Recycling, Inc*., 953 F.Supp.2d 1138
    (D.Colo. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

*United States v. Farkas*, 474 Fed. App'x 349 (4th Cir.  2012) . . . . . . . . .     7

*United States v. Ferrario-Pozzi*, 368 F.3d 5 (1st Cir. 2004) . . . . . . . . . .     2, 3

*United States v. Fujinaga*, 2019 WL 2503939 (D.Nev. June 17, 2019) .     11

*United States v. George*, 886 F.3d 31 (1st Cir. 2018) . . . . . . . . . . . . . . .     9, 17

*United States v. George*, 841 F.3d 55 (1st Cir. 2016) . . . . . . . . . . . . . . . .     1, 2, 4, 5

*United States v. Gorski*, 880 F.3d 27 (1st Cir. 2018) . . . . . . . . . . . . . . . .     10

*United States v. Grose*, 461 Fed. App'x 786 (10th Cir. 2012) . . . . . . . . .     16

*United States v. Hall*, 434 F.3d 42 (1st Cir. 2006) . . . . . . . . . . . . . . . . . .     16

*United States v. Hall*, 411 F.3d 651 (6th Cir. 2005) . . . . . . . . . . . . . . . . .     23

*United States v. Heldeman*, 402 F.3d 220 (1st Cir. 2005) . . . . . . . . . . . . .     20, 21

*United States v. Hollnagel*, 2013 WL 5348317
    (N.D. Ill. Sept. 24, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

*United States v. Horak*, 833 F.2d 1235 (7th Cir. 1987) . . . . . . . . . . . . . .     8

*United States v. Jalaram, Inc.*, 599 F.3d 347 (4th Cir. 2010) . . . . . . . . .     20

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) . . . . . . . . . . . . . .     8

*United States v. Maldonado-Rios*, 790 F.3d 62 (1st Cir. 2015) . . . . . . . .     1, 4, 5

*United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009) . . . . . . . . . . .     9

*United States v. Naphaeng*, 906 F.3d 173 (1st Cir. 2018) . . . . . . . . . . . .     4

*United States v. Nicolo*, 597 F.Supp.2d 342 (W.D.N.Y. 2009) . . . . . . .     11

*United States v. Ofchinick*, 883 F.2d 1172 (3d Cir. 1989) . . . . . . . . . . . .     8

*United States v. Ohle*, 441 Fed. App'x 798 (2d Cir. 2011) . . . . . . . . . . .     17

*United States v. Percoco*, 2019 WL 1593882
    (S.D.N.Y. Apr. 15, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

*United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) . . . . . . . . . . . . .     8

*United States v. Ponzo*, 853 F.3d 558 (1st Cir. 2017) . . . . . . . . . . . . . . .     22

*United States v. Rafael*, 282 F. Supp. 3d 407 (D. Mass. 2017) . . . . . . . .     21

*United States v. Rodriguez-Rosado*, 909 F.3d 472 (1st Cir. 2018) . . . . . . 1, 3, 4, 6

*United States v. Schlesinger*, 396 F.Supp.2d 267 (E.D.N.Y. 2005) . . . . .    12

*United States v. Segal*, 495 F.3d 826 (7th Cir. 2007) . . . . . . . . . . . . . . .    16

*United States v. Sigillito*, 899 F.Supp.2d 850 (E.D. Mo. 2012) . . . . . . . .    12

*United States v. St. Pierre*, 809 F.Supp.2d 538 (E.D.La. 2011) . . . . . . . .    10

*United States v. Torres-Oliveras*, 583 F.3d 37 (1st Cir. 2009) . . . . . . . . .    1, 4

*United States v. Venturella*, 585 F.3d 1013 (7th Cir. 2009) . . . . . . . . . . .    11

## **Constitutional Provisions**

Sixth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . .    23

Eighth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . .    20

## **Statutes and Rules**

18 U.S.C. §981(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *passim*

18 U.S.C. §981(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *passim*

18 U.S.C. §1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

18 U.S.C. §1963(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

18 U.S.C. §3571(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Fed. R. App. P. 12.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

Fed. R. Crim. P 32.2(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

## I.   THE DISTRICT COURT LACKED JURISDICTION TO ENTER THE FORFEITURE ORDER.[1]

This Court did not, contrary to the government's argument, "mistake" anything in *United States v. George*, 841 F.3d 55 (1st Cir. 2016). *See* Brief for the United States ("GB") at 20. Instead, its mischaracterization of this Court's *George* opinion rests upon its own mistaken attempt to differentiate between "jurisdiction" and "divestiture." The two concepts are not separable, as the government's argument would have them; divestiture, in this context, is all about jurisdiction. As the Court framed the issue in *George*: "The question . . . is whether the pendency of the defendant's notice of appeal *divested the district court of jurisdiction* to enter the forfeiture order." *Id.* at 71 (emphasis added). *See, e.g., United States v. Rodriguez-Rosado*, 909 F.3d 472, 477 (1st Cir. 2018)("When a party files an appeal in a case, . . . the divestiture rule ordinarily transfers the district court's 'jurisdiction' to the court of appeals."); *United States v. Maldonado-Rios*, 790 F.3d 62, 64 (1st Cir. 2015)("Because Maldonado's appeal was pending at the time the District Court ruled on his motion to modify the sentence . . . the District Court lacked jurisdiction to enter the order reducing the sentence."); *see also United States v. Torres-Oliveras*, 583 F.3d 37, 44 (1st Cir. 2009)(government argued that district court lacked jurisdiction

---

[1] Carpenter will reply to statements made by the government in its Statement of the Case in the sections herein to which they are most relevant.

to consider defendant's motion for modification of sentence because it was filed after defendant's notice of appeal).[2]

The government's attempt to distinguish *George* is unavailing. The district court did not "enter[] a judgment of forfeiture of proceeds" in this case, GB:20, any more than the district court did in *George.* As in *George,*  the initial judgment in this case "did not contain any dispositive provision with respect to forfeiture," 841 F.3d at 70, but merely said that proceeds, *if any*, would be subject to forfeiture and left the question whether there would be any forfeiture at all open and unresolved. Indeed, as in *George*, "[t]he district court made clear both at the disposition hearing and in its written judgment that forfeiture remained an open, unresolved issue, and took no position as to whether forfeiture would be ordered at all." *Id. See* Brief of Defendant-Appellant Daniel Carpenter ("CB") at 3-4, 18-19.

Thus, this case cannot be analogized to *United States v. Ferrario-Pozzi*, 368

---

[2] The cases dealing with claim-processing rules on which the government relies, *see* GB:18-19 & n.4, are quite beside the point. That the belated filing of a notice of appeal may not eliminate the appellate court's jurisdiction to hear the case has no bearing on what happens once jurisdiction has attached in the appellate court after the filing of a timely notice of appeal. As recently as this year, this Court reaffirmed the "general rule" that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *United States v. Chin*, 913 F.3d 251, 255 (1st Cir. 2019), *quoting Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

F.3d 5 (1st Cir. 2004). *See* GB:21. In *Ferrario-Pozzi*, the original judgment, unlike both this case and *George*, *did* contain a forfeiture order: it provided for forfeiture of no less than $2 million. The later judgment merely amended the amount of the forfeiture as authorized by Fed. R. Crim. P. 32.2(e). *See* CB:19 n.9. Here, by contrast, the order of forfeiture—the first order that any forfeiture would be imposed—entered two months after Carpenter's notice of appeal was filed and his appeal was docketed in this Court.

Nor did *Rodriguez-Rosado* undermine *George*, as the government argues. *See* GB:19-20. On the contrary, the Court reaffirmed its usual practice of vacating the district court's order and remanding "so that the district court, once its jurisdiction has reattached, may consider the issue . . . anew." 909 F.3d at 478 n.6, *quoting George*, 841 F.3d at 72. The *Rodriguez-Rosado* court made it "crystal-clear" that "[n]othing in our opinion today should be taken as giving district courts the green light to ignore the divestiture rule." *Id.* It expressly confined its opinion "wholly to the narrow facts animating the case before [it]" and stressed that it "in no way diminishes the importance of compliance with the divestiture rule." *Id.* In *Rodriguez-Rosado*, the district court entered its order denying the defendant's motion for modification of his sentence for the third time after this Court issued its opinion in the defendant's prior appeal but without waiting for the mandate to issue, a minor jumping of the gun.

3

Because the Court was certain that, if the matter were remanded, the district court would again deny the motion, as it had already done multiple times, and the identical issues would return to this Court on appeal, it proceeded to address the merits of the appeal because "following our usual protocol . . . would be a waste of time." 909 F.3d at 478 & n.6. The same cannot be said here.

This case remains governed by *George*. While there are "'limited exceptions' to the 'general rule' that an appeal ends a district court's jurisdiction," *Maldonado-Rios*, 790 F.3d at 64, *quoting Torres–Oliveras*, 583 F.3d at 44, those exceptions "all pertain 'to district court orders that concern matters unrelated to the 'substance of the decision' being appealed." *George*, 841 F.3d at 71, *quoting Maldonado-Rios*, 790 F.3d at 64. *See United States v. Chin*, 913 F.3d 251, 255 (1st Cir. 2019)(noting that the exception might apply because the order that post-dated the notice of appeal did not "alter the substance of the [prior] decision"). Here, as in *George*, the forfeiture order "does not concern a matter unrelated to the substance of the defendant's appeal" and thus "falls within the general rule, not within the long-odds exception to it." *George*, 841 F.3d at 71.[3] This Court should follow the course set by *George*, a

---

[3] In *United States v. Naphaeng*, 906 F.3d 173 (1st Cir. 2018), *see* GB:21, the district court entered a final restitution order while the appeal was pending but *after* this Court had stayed the appeal; the Court concluded that "[i]n these unusual circumstances, . . . the district court's jurisdiction was intact." *Id.* at 178. Here, however, when the district court entered its forfeiture order, it had been divested of

functionally indistinguishable case, and "remand so that the district court, once its jurisdiction has reattached, *may consider the issue of forfeiture anew*," taking "no view . . . as to either the propriety or amount of a future order of forfeiture." *Id.* at 72 (emphasis added).

Treating the district court's forfeiture order as an indicative ruling, *see* GB:21-22, would be inconsistent with *George*. Rule 12.1 "permits [an appellate court] to remand a case to the district court, while retaining jurisdiction, for the limited purpose of allowing the district court to take action consistent with an earlier indicative ruling." *Mendia v. Garcia*, 874 F.3d 1118, 1121 (9th Cir. 2017). *See, e.g., Maldonado-Rios*, 790 F.3d at 65 (remanding to district court to enter order on defendant's motion to modify sentence that the district court had granted while appeal pending); *United States v. Cardoza*, 790 F.3d 247, 248 (1st Cir. 2015)(same). The remand ordered in *George* was to consider the forfeiture matter *anew*, not simply to

_____

jurisdiction by the filing of Carpenter's first notice of appeal; it could have asked this Court to stay the appeal, but it did not. That this Court ultimately docketed Carpenter's supplemental notice of appeal—that adding the forfeiture order to his original notice of appeal—as a separate case does not operate retroactively to resurrect the district court's jurisdiction to enter the order in the first place. "[S]hared jurisdiction is limited to a circumscribed cluster of situations, the handling of which is not inconsistent with the prosecution of an appeal." *George*, 841 F.3d at 71. The dangers of shared jurisdiction were just as present here as they were in *George* when the district court entered its forfeiture order.

re-enter the previous order entered without jurisdiction. It cannot be assumed, as the government does, that the district court would "almost certainly enter the same forfeiture order," GB:20, when it has the opportunity to reconsider Carpenter's arguments, with particular emphasis on the question whether Carpenter "acquired" exchangors' funds so as to make them subject to forfeiture, *see* CB:20-32; Section II, *infra*, an issue about which the district court expressed considerable skepticism at sentencing. *See* CB:3-4. In addition, the district court entered the forfeiture order without holding the hearing that it told the parties it would hold prior to rendering its decision, *see* CB:4, and further hearing may persuade the court that its prior ruling was erroneous in full or in part.[4]

## II.    CARPENTER DID NOT "ACQUIRE" THE MONEY ORDERED TO BE FORFEITED AS REQUIRED UNDER §981(a)(2)(B).

### A.    Statutory and Legal Framework.

Yes, forfeiture is mandatory, *see* GB:22-23, but only if the statutory

---

[4] The district court did deny Carpenter's motion for reconsideration, *see* GB:20, but the issue raised in that motion related solely to the argument advanced in Section V of Carpenter's brief. While this is the fourth appeal in this case, the first two were taken by the government from orders of the district court granting Carpenter a new trial based on its findings of prosecutorial misconduct. In the third, the Court affirmed Carpenter's conviction. The issues raised in this appeal have not previously been considered by this Court. Thus, this is not a case like *Rodriguez-Rosado*, *see* GB:20, in which remand of the case would result in precisely the same merits issues as had been presented in the prior appeal reappearing before this Court in any subsequent appeal.

requirements for forfeiture have been met. The district court correctly concluded that §981(a)(2)(B), rather than §981(a)(2)(A) was the governing definition of "proceeds" in this case, and forfeiture is, accordingly, mandatory *only* to the extent that Carpenter "acquired" the funds at issue. Because Carpenter did not "acquire" the funds ordered forfeit within the meaning of §981(a)(2)(B), the statutory requirements for forfeiture have not been satisfied in this case.

Because §981(a)(2)(B) supplies the applicable definition of "proceeds" for this case, the government's discussion of the "but for" standard articulated in some cases has no bearing on the permissibility of the forfeiture ordered. *See* GB:24. In any event, however, this Court has never applied the sort of expansive "but for" nexus test articulated in *United States v. Farkas*, 474 Fed. App'x 349 (4th Cir. 2012), the unpublished Fourth Circuit opinion on which the government places its primary reliance, in the context of §981 or §982 forfeitures. *United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990), the only case from this circuit cited by the government, was a RICO forfeiture case, in which context the Court explained that the "but for" test was a *limitation* on the availability of forfeiture: the test was applied because "proceeds or profits constitute property interests outside the enterprise and thus are forfeitable only to the extent they are actually tainted by unlawful activities." *Id.* at 1213. This standard, designed to ensure proportionality in RICO forfeitures, should not be

7

employed to expand forfeiture liability under §981 or §982.[5]

## B.    The District Court Correctly Concluded that §981(a)(2)(B) Supplies the Applicable Definition of "Proceeds" in this Case.

That the §981(a)(2)(A) definition of "proceeds" is applicable in *some* fraud cases does not mean that it is applicable in *every* fraud case, as the government appears to suggest. *See* GB:26. The government's interpretation of §981(a)(2)(A) would render §981(a)(2)(B) effectively meaningless; it narrowly focuses on the specific conduct of the defendant found to have been unlawful—mail/wire fraud—rather than the controlling language of §981(a)(2)(B): "cases involving lawful goods and lawful services that are sold or provided in an unlawful manner." Mail and wire fraud may themselves be unlawful activities, but that is not the governing distinction between §981(a)(2)(A) and §981(a)(2)(B).

> The government's contrary preference for the broader definition of proceeds in §981(a)(2)(A) misreads the statute and overextends its reach. . . . [C]alling Balsiger's wire fraud "unlawful activity" within the meaning of §981(a)(2)(A) risks rendering §981(a)(2)(B) superfluous and thus meaningless. If all unlawful conduct falls within subsection (A), it is far from clear what is left to fit within subsection (B). We cannot conclude Congress intended this result given the differences in language employed in subparts (A) and (B) of §981(a)(2).

*United States v. Balsiger*, 910 F.3d 942, 957 (7th Cir. 2018). *See, e.g., United States v. Mahaffy*, 693 F.3d 113, 137 (2d Cir. 2012)("The government's reading renders

---

[5] Of the eight cases cited by the government, five—*Angiulo*, *DeFries*, *Ofchinick*, *Porcelli*, and *Horak*—were RICO forfeiture cases.

§981(a)(2)(B) essentially meaningless."); *United States v. Nacchio*, 573 F.3d 1062, 1088-89 (10th Cir. 2009)("Sections 981(a)(2)(A) and 981(a)(2)(B) should be read together, and both sections must have meaning").[6]

Section 981(a)(2)(B) applies "[b]y definition" where the crime "involve[s] a good or service that could, hypothetically, be provided in a lawful manner." *United States v. George*, 886 F.3d 31, 40 (1st Cir. 2018)("*George II*"). *See, e.g., United States v. Hollnagel*, 2013 WL 5348317 at *2 (N.D. Ill. Sept. 24, 2013)(applying §981(a)(2)(B) because "[d]efendant's fraudulent financing scheme was not an

---

[6] The government seeks to dismiss *Mahaffy* and *Nacchio* on the ground that they were insider trading cases that involved the lawful activity of trading securities, albeit in an unlawful manner. *See* GB:28. As the *Mahaffy* Court explained, "[t]rading . . . securities, as a general matter, is not unlawful. Rather, any illegality occurred when the defendants bought and sold securities as part of a scheme involving illegal bribery and frontrunning." 693 F.3d at 138. *See Nacchio*, 573 F.3d at 1090 ("Nacchio was not participating in an inherently unlawful activity by selling Qwest stock; trading, by itself, would not have been an unlawful activity. Rather, the illegality inhered in his selling securities ('lawful goods') in an unlawful manner, *i.e.*, 'on the basis of material, nonpublic information.'"). Precisely the same reasoning applies in this case. The provision of §1031 intermediary services is not an inherently unlawful activity; instead, the illegality arose from the manner in which the exchangors' funds were invested while they were being held by BPETCO pending the completion of their exchanges. Under the analysis proposed by the government, with its narrowed focus on the unlawful conduct of the defendant, insider trading would be branded unlawful activity subject to §981(a)(2)(A). *Mahaffy* and *Nacchio* correctly concluded otherwise.

inherently unlawful activity, but rather involved lawful goods or services sold or provided in an illegal manner"); *United States v. Executive Recycling, Inc*., 953 F.Supp.2d 1138, 1158 (D.Colo. 2013)(applying §981(a)(2)(B) because "[t]he predicate act underlying Defendants' convictions – electronics recycling – is not inherently unlawful" and "[w]hat made Defendants' actions unlawful was the manner in which Defendants did business, *i.e*., by misrepresenting to customers where and how their electronic materials would be handled and failing to obtain the required export documentation"); *United States v. St. Pierre*, 809 F.Supp.2d 538, 543 (E.D.La. 2011)(§981(a)(2)(B) applied because "[i]nformation technology work is a lawful service and crime cameras are lawful goods, but the contracts for that work or those cameras were obtained through illegal bribes and kickbacks"); *see also United States v. Gorski*, 880 F.3d 27, 41 (1st Cir. 2018)(parties agreed that §981(a)(2)(B) applied in wire fraud case); *United States v. Butler*, 2013 WL 2298184, at *2 (E.D.Va. May 24, 2013)(parties agreed that §981(a)(2)(B) was applicable in mail fraud case).

The offenses of which Carpenter was convicted fall squarely within this paradigm: §1031 intermediary services can be, and are, provided in a lawful manner. Indeed, the government itself describes the lawfulness of §1031 intermediary services. GB:2-3. The district court correctly concluded that §981(a)(2)(B) was "more apt in the circumstances of this case, which broadly described involved the

'lawful services' of a §1031 intermediary being 'provided in an illegal manner,' that is, by means of mail and wire fraud." Add:10.[7] BPETCO offered, and performed, legitimate §1031 intermediary services, successfully completing 119 of the 126 exchanges for which its services had been engaged, and failed only as to the last seven when Paine Webber closed the account and swept the funds in January 2001 in the wake of the catastrophic downturn in the financial markets in 2000. *See United States v. Carpenter*, 736 F.3d 619, 624 (1st Cir. 2013). The BPETCO marketing materials and Paley's powerpoint presentations—not Carpenter personally—may have promised exchangors a level of safety inconsistent with options trading, *see*

---

[7] "Courts have generally interpreted §981(a)(2)(A) as applying to conduct that is 'inherently unlawful,' *meaning conduct that cannot be committed in a lawful manner*." *United States v. Percoco*, 2019 WL 1593882, at *3 (S.D.N.Y. Apr. 15, 2019)(emphasis added). The cases on which the government relies, GB:26, are all examples of "inherently unlawful" conduct—ones where there were no lawful services provided, and the scheme was a fraud from the get-go. The defendants in *United States v. Bonventre*, 646 Fed. App'x 73 (2d Cir. 2016), were participants in Bernie Madoff's Ponzi scheme. *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205 (11th Cir. 2013), similarly involved a wholly fraudulent Ponzi scheme. *United States v. Venturella*, 585 F.3d 1013 (7th Cir. 2009), involved fraudulent applications for government benefits. *United States v. Emor*, 850 F.Supp.2d 176 (D.D.C. 2012), involved the defendant's conversion of government funds provided for educational purposes to his personal use. *United States v. Nicolo*, 597 F.Supp.2d 342 (W.D.N.Y. 2009), involved a kickback scheme to obtain fraudulent contracts under which defendant generally performed no services. *United States v. Fujinaga*, 2019 WL 2503939 (D.Nev. June 17, 2019), involved the fraudulent solicitation of investments through what was effectively a Ponzi scheme. In none of these cases was there any discussion of whether subsection (A) or subsection (B) should be applied.

GB:26-27, but that does not, as the government argues, make BPETCO's services any less lawful within the meaning of §981(a)(2)(B).

Under the government's expansive view of the reach of §981(a)(2)(A), all mail and wire fraud would fall within that provision, regardless of the legitimacy of the business in the context of which the fraud was perpetrated. Indeed, virtually any crime would, as crimes are by definition unlawful activity. But §981(a)(2) draws a distinction based on the context in which the crime is committed. Fraud is never part of a company's legitimate services, *see* GB:26, but fraud committed in the context of providing lawful services—services that, in the language of *George II*, "could, hypothetically, be provided in a lawful manner," nonetheless falls within §981(a)(2)(B).[8]

### C.    Carpenter Did Not "Acquire" the Monies He Has Been Ordered to Forfeit.

The government has largely not responded to Carpenter's arguments regarding

---

[8] Once again, the cases on which the government relies, GB:27-28, all involve frauds that were wholly illegitimate from the outset. In *United States v. Sigillito*, 899 F.Supp.2d 850 (E.D. Mo. 2012), involved a Ponzi scheme to fraudulently solicit loans purportedly to purchase land in England in which defendants never intended to purchase land but instead to take money for themselves and return monies to earlier investors. In *United States v. Schlesinger*, 396 F.Supp.2d 267 (E.D.N.Y. 2005), the defendants submitted fraudulent insurance claims inflating the damages caused by fires at their business premises; such scheme did not involve the provision of lawful goods or services in an unlawful manner. As for *Bonventre* and *Fujinaga*, see note 7, *supra*.

the proper interpretation of "acquired" as used in §981(a)(2)(B). Yes, "obtain" and "acquire" are often treated as synonymous, GB:31, but the government does not even attempt to explain why Congress chose to use a different verb in subsection (B) than it did in subsection (A) or why the Court should ignore the established canon of statutory construction that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004). *See* CB:23-24.[9]

The government argues that there is "no indication in the legislative history that Congress meant to limit Section 981(a)(2)(B) in the manner that Carpenter suggests," GB:32 n.9, but it is equally true that there is no indication in the legislative history that it did not. On this point the legislative history is silent. There is, however, clear indication that Congress intended that the scope of forfeiture under subsection (B) be

---

[9] *Huddleston v. United States*, 415 U.S. 814, 820-23 (1974), GB:31, provides no guidance as to the proper interpretation of "acquired" in §981(a)(2)(B) (and neither do alternate dictionary definitions of "acquire"). *See Sekhar v. United States*, 570 U.S. 729, 734 (2013)("Obtaining property requires . . . the acquisition of property."). In *Huddleston*, the Court was not confronted. as here, with congressional choice of a different verb than it had used in the preceding subsection. In concluding that "acquisition" was not limited to ownership under the firearms statute at issue, the Court analyzed the relationship of "acquisition" to other language in the statute and the statutory scheme as a whole, finding that it evidenced a congressional intent to apply the statute to all forms of transfers of firearms.

13

more limited than that under subsection (A). While subsection (A) extends to "property of any kind" that the defendant obtained "directly or indirectly" from the commission of the offense and is expressly not limited to net profits, subsection (B) is limited to "money" "acquired" from the illegal transactions. Moreover, Congress' elimination of the "directly or indirectly" language in subsection (A) from subsection (B), as well as the admonition that the amount of the forfeiture is not "limited to the net gain or profit realized from the offense" shows a clear intent to limit forfeiture to the net profits that the defendant himself acquired or which he was entitled to acquire. *See United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012)(invalidating forfeiture that "include[d] funds to which appellant was never entitled"). The government simply assumes that "acquire" does not require ownership or entitlement, *see* GB:32, but provides no analytical support for such a reading of the statute.

Yes, Carpenter was the individual who decided how the exchangors' funds would be invested to generate the promised rate of return, but he did not, by controlling how the funds were invested, "acquire" the funds for himself.  That Carpenter used a trading strategy he that he believed would enable BPETCO to provide the exchangors with the promised 6% return as well as make a profit for BPETCO, *see* GB:33, does not translate to acquiring the investors' funds for his personal benefit. Carpenter did not, contrary to the government's statement, move the

14

funds from the "client accounts" to a separate "trading account." *See* GB:4, 7, 33.
*Both* accounts, at both Merrill Lynch and PaineWebber were custodial client accounts
in BPETCO's name. App:213-14, 548, 843, 1074. At Merrill Lynch, the two accounts
were linked together; clients' funds were generally deposited in the B01 account and
then transferred to the B10 trading account for investment purposes. App:851, 879.
The same was true at PaineWebber. App:1071-72, 1076. Exchangors were expressly
informed in the agreements they signed that their funds would be invested in either
a money market account (for those who chose the 3% option) or a custodial
investment account (for those who, as all the exchangors at issue here did, chose the
6% option, and that "any cash proceeds received from the disposition of the
relinquished property shall be held and invested at Merrill Lynch at the discretion and
through financial institutions of the intermediary." App:254, 258, 1415, 1564. Clients
understood that their funds would be invested at BPETCO's discretion. App:291,
309, 533-34, 716, 1710.

That Carpenter would have acquired profits had his trading strategy succeeded,
*see* GB:33, does not mean that he acquired the exchangors' funds within the meaning
of §981(a)(2)(B)  when they were deposited into the BPETCO custodial accounts.
The government's  argument simply assumes the conclusion.  The cases on which the
government relies, GB:33-34, do not support its contention that Carpenter acquired

15

the exchangors' funds within the meaning of §981(a)(2)(B). *Emor*, which involved wholly unlawful conduct, *see* note 7, *supra*, was a §981(a)(2)(A) case, and the question was whether the defendant had "obtained" the funds "directly or indirectly," not whether he had acquired them.[10] *United States v. Segal*, 495 F.3d 826 (7th Cir. 2007), was a RICO forfeiture case, in which context forfeiture is required of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity. *Id.* at 838, quoting 18 U.S.C. §1963(a)(3). Such cases provide no guidance regarding the scope of forfeiture permissible under §981(a)(2)(B).

Nor does the government's position derive support from cases involving dissipation of the funds obtained (most of which are unreported decisions from other circuits). In *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006), this Court was speaking generally about the need for forfeiture money judgments to "prevent[] a drug dealer from ridding himself of his ill-gotten gains to avoid the forfeiture sanction." *Id.* at 59. In *United States v. Grose*, 461 Fed. App'x 786 (10th Cir. 2012), the defendant stole money from the company where he worked, converted it to his

───────────

[10] *United States v. Allen*, 76 F.3d 1348 (5th Cir. 1996), from which the government's quotation from *Emor* was derived, *see* GB:34, was not a forfeiture case at all but instead concerned whether the funds at issue were "proceeds" for purposes of the money laundering statute, 18 U.S.C. §1956.

own use, and then lost it in a bad investment. In *United States v. Apazidis*, 523 Fed. App'x 17 (2d Cir. 2013), the defendant fraudulently obtained bank loans and then spent the proceeds. In *United States v. Ohle*, 441 Fed. App'x 798 (2d Cir. 2011), the defendant stole money from a trust account and then paid it to another.[11] In each of these cases, the funds at issue came into the personal possession of the defendant and were then spent or otherwise dissipated. The investment of exchangors' funds here was part and parcel of the BPETCO business plan for carrying out the lawful services of a §1031 intermediary. Had Carpenter actually realized a profit which he transferred to himself and then spent, such cases might have relevance. But those are not the circumstances present here.

Forfeitures may "help to ensure that crime does not pay," and may, in theory, "deter illegality," *George II*, 886 F.3d at 42; *see* GB:35, but only to the extent that Congress has so provided. None of the cases cited by the government support the proposition that Carpenter "acquired" the funds within the meaning of §981(a)(2)(B). The central fallacy of the government's arguments is that they all rest on the assumption that §981(a)(2)(A) is the applicable provision.

---

[11] In *United States v. Crumpler*, 229 Fed. App'x 832 (11th Cir. 2007), the defendant contended that value of the stock he fraudulently obtained should have been based on the price at which he sold it rather than the value when he fraudulently obtained it. *United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006), was a §853 drug-case forfeiture, in which all proceeds of the defendant's drug dealing were forfeitable.

17

As for *Contorinis*, *see* GB:35-36, as discussed in Carpenter's opening brief, the "control" to which the court was referring was control *over the firm's profits*, not control over incoming funds. *See* CB:28. Because the portfolio manager in *Contorinis* could not claim for himself the entirely of the hedge fund's profits but only that portion to which he was contractually entitled, he did not have "control" of the funds' profits as required to "acquire" them. Here, Carpenter may have had control over the distribution of profits, had there been any, but, contrary to the government's argument, GB:36, he could not control the distribution of the exchangors' funds from the BPETCO accounts—those funds were required to be returned to the exchangors, and could not have been taken, and were not taken, as profits by BPETCO or Carpenter. Thus, he could not, contrary to the government's argument, unilaterally "decide how the proceeds should be used or disbursed." GB:36. For this reason, the government's reliance on *Rajaratnam v. United States*, 736 Fed. App'x 279 (2d Cir. 2018), is misplaced. Rajaratnam was different from Contorinis—and from Carpenter—because he was effectively the equivalent of the hedge fund in *Contorinis*; he had the control necessary to take Galleon's profits for himself or otherwise decide how the insider trading profits would be distributed. *See SEC* v. *Rajaratnam*, 918 F.3d 36, 43 (2d Cir. 2019)("We held [in *Contorinis*] that someone could not be ordered to forfeit profits that he never received or possessed because

18

'forfeiture' *generally connotes a person's losing an entitlement as a penalty for proscribed conduct*" (emphasis added). Carpenter never gained an entitlement to the exchangors' funds that would make that amount subject to forfeiture.

Carpenter may have expressed frustration about Merrill Lynch's efforts to curtail his trading by saying the money was his, GB:37, but that did not make it so. The plain fact of the matter is that the exchangors' funds were not Carpenter's and would never be; they were to be returned to the exchangors to complete their exchanges.  The same is true as to the PaineWebber accounts. Nor did Carpenter "commingle" funds in the sense used by the government, GB:37; instead, he injected more than $2,000,000 of his own money into the BPETCO accounts in the effort to prevent losses to BPETCO's clients. App:1336. Because Carpenter did not "acquire" the exchangors' funds within the meaning of §981(a)(2)(B), the forfeiture order should be vacated.

### D.    At Minimum, the Statute is Grievously Ambiguous, and the Rule of Lenity Should be Applied.

The government's entire argument regarding the meaning of "acquire," which leaves §981(a)(2)(B) meaning essentially the same as §981(a)(2)(A), amply demonstrates that, if "acquired" is not interpreted to require direct, personal acquisition, then its meaning is grievously ambiguous. *See* CB:32-33.

## III.   THE $14 MILLION FORFEITURE ORDER VIOLATES THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT.

The government first suggests that forfeiture of proceeds can never violate the Eighth Amendment, relying on a withdrawn opinion from the Fifth Circuit and unpublished opinions from the Seventh and Ninth Circuits. GB:39-40. It is, however, firmly established in this circuit that forfeitures are subject to the Eighth Amendment's excessive fines clause "if they constitute punishment for an offense," *United States v. Heldeman*, 402 F.3d 220, 223 (1st Cir. 2005), which the forfeiture in this case does.[12]

As for the first *Heldeman* factor, the government's description of Carpenter's conduct is simply wrong. Carpenter did not, as the government states, clandestinely transfer funds out of the "designated escrow accounts." GB:40. On the contrary, the exchangors' funds were placed in the account designated by the exchangor—the BPETCO investment account. *See* pages 15-16, *supra*; CB:7-8, 35. It may be no defense to mail/wire fraud charges that the defendant did not intend to lose the clients' money, GB:41, but it does differentiate Carpenter from the majority of fraud defendants, whose intent from the outset was to deprive victims of their property.

---

[12] In *United States v. Jalaram, Inc.*, 599 F.3d 347, 352-55 (4th Cir. 2010), cited by the government, GB:40, the Fourth Circuit rejected the argument advanced by the government here that forfeiture of proceeds can never violate the Eighth Amendment, relying on ample Supreme Court precedent that supports Carpenter's position.

As for the second *Heldeman* factor, Congress may have provided for an alternative fine calculation in 18 U.S.C. §3571(d), and, while the statute may have authorized a fine of up to $18 million—something the government did not argue below—the Constitution does not. *See* CB:36-37 n.16. In any event, this Court has made it clear that greater weight should be given to the maximum penalties provided by the Guidelines than those provided by statute. *See* CB:36; *United States v. Rafael*, 282 F. Supp. 3d 407, 412 (D. Mass. 2017)("[T]he guidepost is relatively clear; the forfeiture must not be grossly disproportionate to the maximum fine under the sentencing guidelines."). Here, despite the guidelines commentary that the government quotes, GB:42 n.13, the PSR stated the applicable guidelines fine range as $10,000 to $100,000, SApp:38, the government did not contend otherwise, and the court used this range in imposing a $100,000 fine. The commentary notwithstanding, the maximum fine provided in the guidelines was $100,000.

As for the third *Heldeman* factor, the conduct that the government labeled criminal may have begun in the pre-CAFRA period, GB:43, but the fact of the matter is that 119 of the 126 exchangors were not harmed at all. BPETCO returned their funds, with the designated rate of return, and they successfully completed their exchanges.

The forfeiture ordered here was grossly disproportionate in violation of the

21

Excessive Fines Clause and should be vacated.

## IV.  CARPENTER WAS ENTITLED TO A JURY DETERMINATION OF THE FORFEITURE AMOUNT.

The Court's review of this issue is not, as the government contends, for plain error. This case was tried in 2008, but the forfeiture issue did not arise until the government moved for an order of forfeiture on February 24, 2014, two days before sentencing. App:37. When the court deferred the forfeiture issue for further briefing by the parties, Carpenter raised the issue in his memorandum opposing the government's request for forfeiture. App:2054-57. By its terms, Fed. R. Crim. P. 32.2(b)(5), refers only to forfeitures of specific property, not to money judgment forfeitures. *See United States v. Ponzo*, 853 F.3d 558, 589 (1st Cir. 2017). The rule did not, therefore, contrary to the government's argument, impose any obligation on Carpenter to seek a jury determination as to the amount of any money judgment to be ordered. *See* GB:43-44. The issue is preserved for this Court's review.

The government argues that the *Apprendi/Southern Union* rule does not apply in the forfeiture context. GB:44-45. In his opening brief, Carpenter acknowledged that courts have rejected his argument on this ground but explained why forfeiture—in which context the court sets the mandatory minimum/maximum (which are the same figure) rather than choosing a sentence within a range—should

nonetheless fall within the protection of the Sixth Amendment jury trial guarantee.

CB:44-46.

> Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. . . . Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury.

*Alleyne v. United States*, 570 U.S. 99, 103 (2013). Contrary to the government's

argument, GB:45, *Libretti* is manifestly inconsistent with *Alleyne*, as it expressly

relies on the outmoded "sentencing factor" analysis rejected in *Alleyne*:

> [O]ur analysis of the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection. Our cases have made abundantly clear that a defendant does not enjoy a constitutional right to a jury determination as to the appropriate sentence to be imposed.

*Libretti v. United States*, 516 U.S. 29, 49 (1995).

Of the nine cases cited by the government for the proposition that "[e]very

other court of appeals that has considered the question has held that *Apprendi* and its

progeny do not alter *Libretti's* holding," GB:46 n.17, seven were decided before both

*Alleyne* (2013) and *Southern Union* (2012), and another was decided before *Alleyne*.

These cases cannot, then, have fully considered "*Apprendi* and its progeny." Among

the cases cited by the government is *United States v. Hall*, 411 F.3d 651 (6th Cir.

2005), GB:45 & n.17, but in *United States v. Bradley*, 897 F.3d 779, 784 (6th Cir.

2018), the court stated that whether *Southern Union* applies to forfeiture "is an unanswered question in this circuit."

## V. EVEN IF CARPENTER COULD BE FOUND TO HAVE "ACQUIRED" THE EXCHANGORS' FUNDS FOR PURPOSES OF APPLYING §981(a)(2)(B), THE FORFEITURE AMOUNT SHOULD BE REDUCED BY THE AMOUNT OF MONEY RETURNED TO THE EXCHANGORS.

The district court's conclusion that the amount of the funds placed in BPETCO's hands by the exchangors at issue was the "gross proceeds" of Carpenter's offenses, GB:28-29, is only as valid as its conclusion that those funds were "acquired" by Carpenter within the meaning of §981(a)(2)(B). That conclusion was erroneous for the reasons addressed in Section II, *supra*, and in Section II of Carpenter's opening brief.

Carpenter's argument in this appeal is limited to what was presented at sentencing and subsequent briefing of the forfeiture issue. Because it does not address the district court's denial of his motion for reconsideration, the court's ruling on that motion has no bearing on the issue now before this Court. *See* GB:29.

Carpenter contended at sentencing that the amount of the forfeiture that could be ordered, if forfeiture could properly be ordered at all, had to be reduced to reflect the amount of money returned to the exchangors, which was a direct cost of BETCO's doing business. *See* CB:47. The district court had all the figures before it that it

24

needed: the difference, Carpenter contended at sentencing, between the total amount entrusted to BPETCO by the exchangors at issue and the losses suffered by the exchangors, *see* SApp:13, reflected the monies returned to exchangors as a cost of BPETCO's conducting its property exchange business. *See* App:1951-52. Contrary to the government's argument, *Hollnagel* is precisely on point. Defendants may have provided the court with a detailed cost analysis, GB:30 n.7, but the court agreed with the defendant that since distributions to investors were direct costs, its analysis need not proceed further. 2013 WL 5348317, at *4.

## CONCLUSION

For all the foregoing reasons, and all the reasons set forth in Carpenter's opening brief, the forfeiture order entered in this case should be vacated.

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-8616 (Telephone)
(617) 338-9538 (Fax)
homanlaw@aol.com

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————————

No. 14-1641

————————————

UNITED STATES,
Appellee

v.

DANIEL E. CARPENTER,
Defendant-Appellant

————————————

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS

————————————

This brief has been prepared using:

> 14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:
> Wordperfect Office X8, 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, appellant's reply brief contains, in total:

> 6,498 words.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

**/s/ Kimberly Homan**
Kimberly Homan

26

**CERTIFICATE OF SERVICE**

I, Kimberly Homan, hereby certify that on this 24th day of July, 2019, this Reply Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

<u>**/s/ Kimberly Homan**</u>
Kimberly Homan